1    UNITED STATES DISTRICT COURT
     CENTRAL DISTRICT OF CALIFORNIA
2    WESTERN DIVISION

3

4    UNITED STATES OF AMERICA,  )
                                )
5                    Plaintiff,  )
                                )
6             vs.                )    Case No.  CR 21-00207-DMG
                                )
7    PATRICK MURPHY O'REILLY,    )        Los Angeles, California
                                )         November 3, 2021
8                    Defendant.  )
     _____)

9

10

11              REVIEW/CONSIDERATION BOND HEARING

12        BEFORE THE HONORABLE STEVE KIM
13        UNITED STATES MAGISTRATE JUDGE

14

15

16
     APPEARANCES:              See Next Page
17
     COURT REPORTER:           Recorded, Court Smart
18
     COURTROOM DEPUTY:         Connie Chung
19
     TRANSCRIBER:              Dorothy Babykin
20                             Courthouse Services
                               1218 Valebrook Place
21                             Glendora, California  91740
                               (626) 963-0566
22

23
     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
24   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

25

1    APPEARANCES:

2

    FOR PLAINTIFF UNITED STATES OF AMERICA:
3
              TRACY WILKISON, ACTING
4              UNITED STATES ATTORNEY
              BY:  JAMES SANTIAGO
5              ASSISTANT UNITED STATES ATTORNEY
              312 NORTH SPRING STREET
6              LOS ANGELES, CALIFORNIA  90012

7

    FOR DEFENDANT PATRICK MICHAEL O'REILLY:
8
              CUAUHTEMOC ORTEGA
9              FEDERAL PUBLIC DEFENDER
              BY:  LISA LA BARRE
10             SUPERVISING ATTORNEY
              DEPUTY FEDERAL PUBLIC DEFENDER
11             BY:  LAKESHIA ADENIYI-DORSEY
              DEPUTY FEDERAL PUBLIC DEFENDER
12             321 EAST 2ND STREET
              LOS ANGELES, CALIFORNIA  90012

13

14    ALSO PRESENT:

15    HANOHOV YOEL
     U.S. PRETRIAL SERVICES AND PROBATION OFFICER
16
     DARYL CROUSE
17    AMERICAN SIGN LANGUAGE INTERPRETER

18

19

20

21

22

23

24

25

1                              I N D E X

2      CR 21-00207-DMG                                November 3, 2021

3      PROCEEDINGS:   Review/Reconsideration of bond hearing

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dorothy Babykin Courthouse Services
1218 Valebrook Place   •   Glendora, CA 91740   •   626.963.0566   •   dotnisbet@aol.com

1              LOS ANGELES, CALIFORNIA; NOVEMBER 3, 2021

2              THE CLERK:   CALLING CASE NUMBER CR 21-00207, UNITED

3      STATES OF AMERICA VERSUS PATRICK MICHAEL O'REILLY.

4              COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

5      RECORD.

6              MR. SANTIAGO:  GOOD MORNING, YOUR HONOR.

7              JAMES SANTIAGO APPEARING ON BEHALF OF THE UNITED

8      STATES.

9              MS. LA BARRE:  GOOD MORNING, YOUR HONOR.

10             LISA LA BARRE APPEARING ON BEHALF OF PATRICK MICHAEL

11     O'REILLY.

12             I APOLOGIZE, YOUR HONOR.  MY COLLEAGUE LAKESHIA

13     ADENIYI-DORSEY IS PRESENT WITH ME AS WELL.

14             MR. O'REILLY IS BEING ASSISTED BY AN AMERICAN SIGN

15     LANGUAGE INTERPRETER.

16             THE COURT:  OKAY.  AND DO YOU HAVE ANYONE FROM THE

17     FAMILY WITH YOU HERE TODAY?

18             MS. LA BARRE:   NO, YOUR HONOR.

19             THE COURT:  ALL RIGHT.

20             MS. LA BARRE:   I SPOKE WITH YULIA REILLY THIS MORNING.  SHE

21     AFFIRMED THAT SHE IS WILLING TO BE A SURETY.  SHE LIVES IN SAN

22     FRANCISCO, SO

23             THE COURT:  UNDERSTOOD.

24             MS. LA BARRE:  WITH HER DAUGHTER.  SO,  UNFORTUNATELY

25     SHE COULD NOT BE HERE TODAY.

1              THE COURT:  ALL RIGHT.

2              AND SHOULD WE HAVE THE SIGN LANGUAGE INTERPRETER JUST

3     IDENTIFY HIMSELF FOR THE RECORD.

4              MR. CROUSE:  GOOD MORNING, YOUR HONOR.

5              MY NAME IS DARYL CROUSE. D-A-R-Y-L C-R-O-U-S-E.

6              I'M NATIONALLY CERTIFIED BY THE REGISTRY OF INTERPRETERS

7     FOR THE DEAF --

8              THE COURT:  THANK YOU.

9              ALL RIGHT.  THANK YOU.

10             AND FROM PRETRIAL?

11             U.S. PRETRIAL SERVICES AND PROBATION OFFICER:  GOOD

12     AFTERNOON, YOUR HONOR.

13             THIS IS YOEL HANOHOV WITH FEDERAL PROBATION AND

14     PRETRIAL SERVICES.

15             THE COURT:  OKAY.  GREAT. THANKS.

16             YOU CAN SIT WHEREVER YOU WANT, I MEAN.  BUT IF YOU

17     WOULD LIKE TO SIT OVER HERE YOU'RE CERTAINLY FREE TO.

18             U.S. PRETRIAL SERVICES AND PROBATION OFFICER:  THANK

19     YOU, YOUR HONOR.

20             THE COURT:  IT'S UP TO YOU.  WHATEVER IS EASIER.

21             THANK YOU TO EVERYONE FOR BEING HERE TODAY.  WE'RE

22     HERE FOR THE BAIL REVIEW IN THIS MATTER.

23             I SHOULD – SORT OF A COUPLE OF HOUSEKEEPING MATTERS.

24             IF WHEN YOU'RE SPEAKING, IF IT'S EASIER FOR YOU TO DO IT

25     WITHOUT A MASK, IT'S YOUR CHOICE.   SO, USE YOUR JUDGMENT AND MAKE

1   YOUR OWN CHOICE ABOUT THAT.  BUT IF YOU PREFER TO KEEP IT ON, OF

2   COURSE DO SO.  BUT JUST IF IT GETS HARD TO SPEAK OR BREATHE, I DIDN'T

3   WANT YOU TO -- I'M NOT STOPPING YOU FROM TAKING OFF THE MASK IF IT'S

4   EASIER FOR YOU TO SPEAK.

5          I ALSO HAVE THE PARTIES' BRIEFS AND THE UPDATED PRETRIAL

6   SERVICES REPORT THAT WAS FILED TODAY.   I SHOULD NOTE A CORRECTED

7   ONE WAS SENT, BUT THE ONLY CORRECTION WAS THAT THE ORIGINAL ONE

8   DID NOT ATTACH THE PRIOR PRETRIAL SENTENCE REPORT.  AND, SO, THE

9   UPDATE WAS JUST SIMPLY ATTACHING THE OLD PRETRIAL SERVICES

10  REPORT.

11         BUT, MS. LA BARRE, HAVE YOU HAD A CHANCE TO REVIEW THE

12  UPDATED REPORT AND EVERYTHING THAT PRETRIAL SERVICES HAS

13  PROVIDED?

14         MS. LA BARRE:  I HAVE, YOUR HONOR.

15         THE COURT:  OKAY.

16         I THINK THAT I HAVE EACH SIDE'S ARGUMENTS IN HAND.  SO, IF

17  IT'S OKAY, I WOULD LIKE TO MAYBE JUST START ASKING SOME QUESTIONS

18  FIRST WITH THE GOVERNMENT AND THEN WITH MS. LA BARRE.  AND, THEN,

19  I'LL GIVE EACH SIDE A CHANCE TO MAKE ANY OPEN AND FREE REMARKS IF

20  THAT'S OKAY.  BUT IT MIGHT BE EASIER IF YOU ANSWER MY QUESTIONS.

21  AND THAT WOULD PROBABLY HONE IN ON THE THINGS THAT I CARE ABOUT

22  ANYWAY.

23         MS. LA BARRE:  CERTAINLY, YOUR HONOR.

24         THE COURT:  OKAY.  SO, MR. SANTIAGO, LET ME JUST START.

25         IS -- IS OBSTRUCTION OF JUSTICE OR WITNESS TAMPERING NOT

1   ONE OF THE GROUNDS ON WHICH YOU'RE SEEKING DETENTION? IT'S JUST

2   FLIGHT, NON-APPEARANCE AND DANGER?

3          MR. SANTIAGO: IT IS FOR THE WITNESS TAMPERING AS WELL,

4   YOUR HONOR.

5          THE COURT: OKAY. I DIDN'T NOTICE THAT IN THE BRIEF. SO, I --

6          OR WAS THAT IN THERE? DID I NOT NOTICE THAT?

7          MR. SANTIAGO: I BELIEVE I LISTED IT AS JUST ONE OF THE

8   COUNTS BUT NOT – MAYBE NOT EXPLICITLY THAT –

9          THE COURT: NO. I MEAN AS A GROUND FOR DETENTION IS WHAT

10   I'M TALKING ABOUT.

11          MR. SANTIAGO: IT'S -- IT'S ADDITIONAL INFORMATION

12   SUPPORTING DETENTION, YOUR HONOR.

13          THE COURT: ALL RIGHT. BUT IT'S JUST NON-APPEARANCE AND

14   DANGER ARE THE ONLY GROUNDS.

15          MR. SANTIAGO: YES.

16          THE COURT: OKAY.

17          AND IN THE INDICTMENT YOU MAKE REFERENCE TO THE

18   INVESTMENT SCHEME.

19          WHAT – I GUESS WHAT CAN YOU TELL ME AS TO WHY THERE

20   WASN'T A FRAUD CHARGE IN THE INDICTMENT.

21          MR. SANTIAGO: YOUR HONOR, THE – WHAT PROMPTED THE

22   FILING OF A COMPLAINT AND THEN THE SUBSEQUENT INDICTMENT WAS THE

23   ACTUAL WITNESS TAMPERING ITSELF.

24          THE COURT: I SEE.

25          MR. SANTIAGO: IT BEGAN WITH THE INVESTIGATION BASED ON A

1   FRAUDULENT INVESTMENT SCHEME THAT THE GOVERNMENT HAS

2   CONTINUED TO INVESTIGATE INVOLVING DEFRAUDING INVESTORS OF

3   APPROXIMATELY $1.5 MILLION AT LEAST I THINK AND SPECIFIC TO THE

4   PRIMARY VICTIM.

5              BUT THERE ARE MULTIPLE PEOPLE IDENTIFIED IN THE

6   COMPLAINT WHO HAVE INVESTED WITH THIS DEFENDANT IN HIS MULTIPLE

7   CORPORATIONS.  I BELIEVE HE HAS – THE GOVERNMENT HAS PRODUCED

8   APPROXIMATELY BUSINESS DOCUMENTATION REGARDING 11 PUBLICLY –

9   PUBLIC COMPANIES CONTROLLED BY THIS DEFENDANT.

10             THE COURT:  OKAY.  BUT RIGHT NOW THAT'S NOT THE

11  SUBJECT --

12             MR. SANTIAGO:  OKAY.

13             THE COURT:  --  OF ANY CHARGES.

14             (THE COURT CONFERRING WITH CRD)

15              THE COURT:  OKAY. YEAH.

16             MS. LA BARRE, DO YOU MIND JUST TAKING A SEAT.

17              AND THEN  -- IT SOUNDS LIKE FOR THE RECORDING IT'S BEST IF

18  --

19             MS. LA BARRE:  YES.

20             THE COURT:  -- THE SPEAKERS USE THE – THE LECTERN.

21             MS. LA BARRE:  OH, OKAY.

22             MR. SANTIAGO:  IS THAT BETTER, YOUR HONOR?

23             THE COURT:  YEAH.

24             MR. SANTIAGO:  YES.

25             WOULD YOU LIKE ME TO CONTINUE, YOUR HONOR.

1          JUST TO –

2          THE COURT:  YEAH.  YEAH.  YOU DON'T NEED TO START OVER.

3          BUT OKAY.  BUT AS OF NOW IT'S NOT OBVIOUSLY CHARGED.

4          MR. SANTIAGO:  THAT IS CORRECT, YOUR HONOR.

5          THE COURT:  OKAY.

6          MR. SANTIAGO:  BUT TO SUCCINCTLY ANSWER YOUR QUESTION,

7    THE PROMPTING OF THE COMPLAINT WHILE THIS WAS STILL BEING

8    INVESTIGATED WAS THE WITNESS TAMPERING.

9          THE COURT:  OKAY.  AND THEN ON THE FIREARMS THERE'S

10   MENTION ABOUT HOW THE FATHER USED IT.

11         I JUST – I GUESS I WANT TO MAKE SURE I UNDERSTAND.

12         THE PRETRIAL SERVICES REPORT SHOWS THAT HIS PARENTS

13   ARE DECEASED.

14         SO, ARE WE TO ASSUME THAT THIS WAS DONE BEFORE THEY

15   WERE DECEASED?

16         MR. SANTIAGO:  WELL, AS ALLEGED IN THE COMPLAINT, YOUR

17   HONOR, AND IN THE GOVERNMENT'S PAPERS, DEFENDANT WAS PREVIOUSLY

18   ADJUDICATED AS MENTALLY DEFECTIVE.

19         THE COURT:  UH-HUH.

20         MR. SANTIAGO:  AND IN THE SEARCH OF HIS RESIDENCES HERE

21   IN LOS ANGELES  -- NOT IN SAN FRANCISCO -- IS WHERE OFFICERS IDENT- --

22   FOUND THESE 19 FIREARMS.

23         IN THE SUBSEQUENT INVESTIGATION INTO THESE 19 FIREARMS

24   THE GOVERNMENT DISCOVERED THAT THEY WERE PURCHASED WITH MR.

25   O'REILLY'S CREDIT CARD BY HIS FATHER AS A STRAW PURCHASER.

1          THE COURT:  BUT THERE'S NO DISPUTE RIGHT NOW THAT HIS

2     PARENTS ARE DECEASED, RIGHT?

3          MR. SANTIAGO:  NO, YOUR HONOR.

4          THE COURT:  OKAY.  ALL RIGHT.  I JUST WANTED TO MAKE SURE.

5          AND WHAT STAGE IS THE CASE IN RIGHT NOW IN FRONT OF

6     JUDGE GEE?  IS IT SET FOR TRIAL?

7          MR. SANTIAGO:  THE CURRENT TRIAL DATE, YOUR HONOR, I

8     BELIEVE IS APRIL 1.  I WOULD HAVE TO CHECK THE DATE.  BUT –

9          THE COURT:  APRIL 1, 2022?

10         MS. LA BARRE:  APRIL 5TH, YOUR HONOR.

11         THE COURT:  OKAY.  BUT IN APRIL OF 2022.  SO, NEXT YEAR.

12         MR. SANTIAGO:  CORRECT, YOUR HONOR.

13         THE COURT:  OKAY.

14         AND I GUESS WITHOUT GOING INTO THE DETAILS, IS THERE A

15     PLEA AGREEMENT DISCUSSION HAPPENING?  OR IS THERE NOT ONE

16     HAPPENING?

17         MR. SANTIAGO:  NOT AT THIS TIME, YOUR HONOR.  JUST

18     APPROXIMATELY TWO WEEKS AGO DEFENDANT WAS FOUND TO BE

19     MENTALLY COMPETENT.

20         THE COURT:  GOT IT.  OKAY.

21         BUT PLEA DISCUSSIONS ARE STILL ON THE TABLE?

22         MR. SANTIAGO:  YES, YOUR HONOR.

23         THE COURT:  OKAY.

24         AND, SO, WHAT IS THE BACK OF THE ENVELOPE ON HIS

25     SENTENCING EXPOSURE UNDER THE GUIDELINES IF HE WERE CONVICTED?

1          MR. SANTIAGO:  THE – I ONLY HAVE A ROUGH SKETCH HERE,

2    YOUR HONOR.

3          THE COURT:  UH-HUH.

4           MR.  SANTIAGO:  BUT THE MAIN CHARGE WOULD BE THE

5    POSSESSION OF THE 19 FIREARMS.

6          THE COURT:  UH-HUH.

7          THERE'S NO MANDATORY MINIMUM, RIGHT?  SO, IT'S ALL

8    GUIDELINES RANGE.

9          MR. SANTIAGO:  THAT IS CORRECT, YOUR HONOR.

10          THE COURT:  AND WITH CRIMINAL HISTORY, WHAT'S YOUR

11    ESTIMATE ON THE GUIDELINES RANGE? – ASSUMING CONVICTION AGAIN, OF

12    COURSE.

13          MR. SANTIAGO:  YOU KNOW, I DON'T HAVE MY SENTENCING

14    TABLE BEFORE ME, YOUR HONOR.

15          BUT I THINK FOR A TOTAL OFFENSE LEVEL JUST FOR THE

16    FIREARMS ALONE I BELIEVE IT'S AT LEAST 24.

17          THE COURT:  WHICH WOULD YIELD WHAT? – A  --

18          OKAY.  BUT THERE IS CUSTODY TIME?

19          MR. SANTIAGO:  YES, YOUR HONOR.

20          THE COURT:  OKAY.

21          I THINK THAT'S ALL –

22          MR. SANTIAGO:  AND, YOUR HONOR, JUST ONE MORE THING

23    REGARDING  --

24          THE COURT:  SURE.

25          MR. SANTIAGO:   -- THAT IS A ROUGH  -- THE GOVERNMENT IS BY

1    NO MEANS REPRESENTING THAT IS THE ACTUAL –

2                 THE COURT:  NO.  UNDERSTOOD.

3                 MR. SANTIAGO:  YOU KNOW, THAT WAS JUST --

4                 THE COURT:  UNDERSTOOD.

5                 OKAY.  ALL RIGHT.

6                 MS. LA BARRE, CAN I ASK YOU SOME QUESTIONS.

7                 MS. LA BARRE:  YES, YOUR HONOR.

8                 THE COURT:  SO, THE SEARCH IN THIS CASE  --

9                 OH, AND I GUESS I SHOULD ADD.

10                 MR. O'REILLY, I KNOW IT'S – IT'S UNSETTLING TO BE TALKED

11   ABOUT IN THE THIRD PERSON WHEN YOU'RE IN THE ROOM.

12                 UNFORTUNATELY, IT'S BECAUSE OF THE COURT THAT WE'RE IN,

13   YOU KNOW, YOU HAVE TO LET YOUR ATTORNEY SPEAK FOR YOU.  BUT I

14   DIDN'T WANT YOU TO THINK I WAS UNAWARE OF THE FACT THAT WE'RE

15   TALKING ABOUT YOU IN THE THIRD PERSON WHILE YOU'RE IN THE ROOM.

16                 BUT YOU COULDN'T HAVE A BETTER SPOKESPERSON THAN MRS.

17   – THAN MS. LA BARRE.

18                 SO, WE'LL HAVE TO DO A LOT OF THIRD-PERSON REFERENCES

19   TO YOU.   BUT WE MEAN NO OFFENSE.

20                 THE SEARCH THAT YIELDED THE FIREARMS, IT'S AN APARTMENT

21   THAT HE WAS STAYING HERE IN L.A. AT THE TIME.

22                 BUT YOU'RE SAYING THE SAN FRANCISCO APARTMENT WAS

23   ALWAYS KEPT --

24                 MS. LA BARRE:  YES.  HE HAD RESIDENCES --

25                 THE COURT:   -- AS WELL?

1            MS. LA BARRE:  -- IN SAN FRANCISCO NEAR HIS JOB THERE.  AND

2    HE ALSO HAD A RESIDENCE IN L.A.

3            THE RESIDENCE IN L.A. IS NO LONGER AVAILABLE TO HIM.

4            THE COURT:  GOT IT.

5            MS. LA BARRE:  HOWEVER, I CONFIRMED WITH MS. REILLY, HIS

6    EX-WIFE, THAT THE RESIDENCE IN SAN FRANCISCO IS STILL AVAILABLE.  IT

7    WAS PROTECTED UNDER COVID PROTECTIONS.  SO, IT IS STILL AVAILABLE

8    FOR HIM  --

9            THE COURT:  OKAY.  THAT'S THE OTHER QUESTION I HAD --

10           MS. LA BARRE:  -- TO LIVE IN.

11           THE COURT:  -- WAS HOW THE RENT WAS MAINTAINED.  BUT  IT'S

12   BECAUSE THAT NO EVICTIONS WERE ALLOWED.

13           MS. LA BARRE:  EXACTLY, YOUR HONOR.

14           THE COURT:  OKAY.

15           MS. LA BARRE:  THE EVICTION MORATORIUM.

16           THE COURT:  SO, THE PROTECTIVE ORDERS OR THE

17   RESTRAINING ORDERS ONLY RELATE TO PEOPLE AT THE L.A. PROPERTY?

18           MS. LA BARRE:  THAT'S CORRECT, YOUR HONOR.

19           THE COURT:  OKAY.

20           MS. LA BARRE:  AND HE DOES NOT INTEND TO GO BACK TO THE

21   L.A. PROPERTY.

22           THE COURT:  RIGHT.  SO, BUT THOSE RESTRAINING ORDERS

23   DON'T HAVE ANYTHING TO DO WITH THE SAN FRANCISCO  --

24           MS. LA BARRE:  CORRECT.

25           THE COURT:  -- APARTMENT.

1        OKAY.

2        (PAUSE IN PROCEEDINGS.)

3        THE COURT:  AND AS BEST YOU KNOW RIGHT NOW, YOU KNOW, I

4    UNDERSTAND ABOUT THE HISTORY OF THE – ABOUT THE COMPETENCY

5    EXAMINATION AND THE REPORT AND THINGS.

6        AND THE REPORT AS IT STANDS NOW IS THAT HE IS VERY MUCH

7    STABLE AND ABLE TO WORK WITH YOU.

8        IS HE AT MDC RIGHT NOW?

9        MS. LA BARRE:  YES.  HE'S AT MDC.

10       THE COURT:  AND IS – IS THE MEDICATION THAT HE'S TAKING

11   BEING TO YOUR KNOWLEDGE PROVIDED BY THEM CONSISTENTLY?

12       MS. LA BARRE:  YES, DAILY.

13       THE COURT:  OKAY.

14       MS. LA BARRE:  DAILY.  DAILY MEDICATION.

15       THE COURT:  OKAY.  AND IT'S  -- AND IT'S LITHIUM, RIGHT?

16       MS. LA BARRE:  CORRECT.

17       THE COURT:  OKAY.

18        WHEN YOU REFER TO MS. JOKIEL AS HIS PARTNER, IS THIS THE

19   SAME PERSON WHO THE REPORT SAYS IS A GIRLFRIEND IN POLAND WITH A

20   CHILD OF THEIRS OF AGE 5.  OR ARE THOSE DIFFERENT PEOPLE?

21       MS. LA BARRE:  THAT'S CORRECT.  HIS CURRENT GIRLFRIEND IS

22   NATALIA JOKIEL.  AND HIS EX-WIFE IS ULIA O'REILLY.

23       THE COURT:  OKAY.  BUT THE – WHEN THIS SAYS, "DEFENDANT

24   HAS ANOTHER CHILD WHO RESIDES WITH DEFENDANT'S GIRLFRIEND IN

25   POLAND."

1        MS. LA BARRE:  YES.  HE HAS A CHILD WITH MS. JOKIEL AS WELL

2    AS A CHILD WITH MS. REILLY.

3        THE COURT:  OKAY.  BUT THE  -- WHERE DOES THE 5-YEAR-OLD

4    CHILD RESIDE?  -- THE CHILD WITH MS. JOKIEL.

5        MS. LA BARRE:  IN POLAND.

6        THE COURT:  OH, IN POLAND.

7        BUT MS. JOKIEL IS HERE?

8        MS. LA BARRE:  NO.  MS. JOKIEL IS IN POLAND.

9        THE COURT:  OH, I SEE.  SHE'S A POLISH  -- SHE'S A POLISH

10    CITIZEN.

11        MS. LA BARRE:  SHE IS A POLISH CITIZEN, YOUR HONOR.

12        THE COURT:  OKAY.

13        SO, SHE'S NOT GOING TO BE IN THE UNITED STATES AT ALL?

14        MS. LA BARRE:  NO, YOUR HONOR.

15        THE COURT:  OKAY.

16        AND THEN MS. REILLY YOU SAID LIVES IN SAN FRANCISCO.

17        HOW CLOSE TO THE APARTMENT?  I KNOW IT SAYS IT'S CLOSE.

18    BUT LIKE WHAT DO WE MEAN IN TERMS OF CLOSE?

19        MS. LA BARRE:  I THINK SEVERAL BLOCKS.

20        THE COURT:  OH, OKAY.

21        MS. LA BARRE:  VERY CLOSE.

22        THE COURT:  VERY CLOSE.

23        MS. LA BARRE:  AND CERTAINLY HE WANTS TO VISIT THEIR

24    MUTUAL – THEIR CHILD IN COMMON AND BE IN THEIR CHILD'S LIFE.

25        THE COURT:  RIGHT.

1          AND THEN WITH RESPECT TO -- THE EMPLOYMENT AND

2     FINANCES ARE SORT OF RELATED.

3          I UNDERSTAND WHY YOU DON'T WANT HIM TO DISCUSS

4     FINANCES IN ANY DETAIL IN THE REPORT.  AND THAT'S FINE.

5          BUT I GUESS I JUST WANT TO KNOW IN THIS TIME THAT HE'S

6     BEEN INCARCERATED HOW HAS, YOU KNOW, THE BUSINESS BEEN

7     MAINTAINED IN SOME WAY THAT HE COULD SORT OF RESUME IT.

8          MS. LA BARRE:  EVERYTHING HAS BEEN FROZEN.  IT HAS BEEN

9     DIFFICULT FOR MR. O'REILLY.

10          THE COURT:  UH-HUH.

11          MS. LA BARRE:  I BELIEVE THAT MS. REILLY IS WILLING TO HELP

12     HIM GET BACK ON HIS FEET WHILE HE SEARCHES FOR EMPLOYMENT.

13          THE COURT:  GOT IT.

14          NOW, DOES SHE – SHE REPORTED THAT SHE DOESN'T -- THAT

15     DEFENDANT HAS NO MENTAL HEALTH ISSUES.

16          I MEAN, WAS SHE INFORMED OF THAT WHEN SHE WAS ASKED

17     WHETHER SHE COULD BE A SURETY?

18          MS. LA BARRE:  I WAS NOT PRESENT DURING THE INTERVIEW.

19     BUT SHE IS AWARE.  I HAVE BEEN CONTACTING HER THROUGHOUT SINCE

20     THE VERY BEGINNING OF THIS CASE, HIS ARREST IN 2020  --

21          THE COURT:  RIGHT.

22          MS. LA BARRE:  APRIL 2020.  SHE IS AWARE OF THE ISSUES.

23          SHE WAS NOT AWARE OF A SPECIFIC DIAGNOSIS.  I DID NOT

24     SHARE HIS MEDICAL RECORDS WITH HER.

25          THE COURT:  OH, I SEE.

1          MS. LA BARRE:  BUT SHE HAS BEEN AWARE OF THE

2   COMPETENCY HEARING, HIS  --

3          THE COURT:  RIGHT.

4          MS. LA BARRE:  -- HOSPITALIZATION AT WHITE MEMORIAL.

5          I HAVE BEEN KEEPING HER UPDATED AS TO THE SITUATION.

6          THE COURT:  SO, WHEN SHE REPORTED TO MR. HANOHOV THAT

7   DEFENDANT HAS NO MENTAL HEALTH ISSUES.  THAT'S SORT OF NOT QUITE

8   ACCURATE.

9          YOU MEAN IS THAT SHE'S NOT AWARE OF SPECIFIC DIAGNOSES.

10  BUT –

11         MS. LA BARRE:  I THINK THAT  -- I THINK THAT IS THE CASE.

12  SHE'S NOT AWARE OF A SPECIFIC DIAGNOSIS.

13         THE COURT:  BUT SHE HAS TO BE  --

14         MS. LA BARRE:  BECAUSE I HAVE NOT SHARED  --

15         THE COURT:  OKAY.

16         MS. LA BARRE:  -- HIS MEDICAL RECORDS WITH HER.

17         THE COURT:  GOT IT.  BUT SHE HAS SOME GENERAL AWARENESS

18  OF  --

19         MS.  LA BARRE:  SHE  -- SHE DOES.  SHE IS AWARE OF HIS

20  HOSPITALIZATION AT WHITE MEMORIAL AND OF HIS CURRENT SITUATION AT

21  MDC.

22         THE COURT:  WELL, WHAT ABOUT BEFORE?  EVEN DURING THE

23  '20,  '21 PERIOD BEFORE HIS ARREST?

24         MS. LA BARRE:  YES.  HE WAS NOT UNDERGOING MEDICAL  --

25  MENTAL HEALTH TREATMENT AT THAT PERIOD.  SO, THERE WAS NO OFFICIAL

1    DIAGNOSIS.

2                    THE COURT:   OKAY.

3                    MS. LA BARRE:  THE GOVERNMENT NOTES HIS ERRATIC

4    BEHAVIOR AT THE TIME OF HIS ARREST AS A FACTOR FOR DANGER.

5                    BUT HE HAS SINCE RECEIVED PSYCHIATRIC CARE.   HE WAS

6    HOSPITALIZED.  HE IS --

7                    THE COURT:  PSYCHIATRIC CARE WHERE?

8                    MS. LA BARRE:  AT WHITE MEMORIAL AND AT MDC.

9                    THE COURT:  OH, WELL, YEAH.  IN CONNECTION WITH THE --

10   WITH THE COMPETENCY EXAMINATION.

11                   MS. LA BARRE:  EXACTLY, YOUR HONOR.

12                   THE COURT:  NO, BUT I GUESS I MEAN BEFORE HIS ARREST IS

13   WHAT I'M  --

14                   MS. LA BARRE:  HE WAS NOT RECEIVING MENTAL HEALTH

15   TREATMENT.

16                   THE COURT:   OKAY.

17                   MS. LA BARRE:  SO, I BELIEVE THAT MS. REILLY  --

18                   THE COURT:  OBVIOUSLY ONE OF THE CONDITIONS THAT YOU  --

19                   MS. LA BARRE:  OH, SORRY.

20                   THE COURT:  -- ARE OKAY WITH IS GETTING SOME KIND OF

21   MENTAL HEALTH EVALUATION AND TREATMENT?

22                   MS. LA BARRE:  ABSOLUTELY.  WE WOULD REQUEST A

23   CONDITION THAT HE CONTINUE TO TAKE HIS MEDICATION AS PRESCRIBED

24   AND THAT HE RECEIVES A MENTAL HEALTH EVALUATION AND SEES A

25   THERAPIST REGULARLY.

1          THE COURT:  RIGHT.

2          SO, I GUESS  -- AND I TAKE YOUR POINT ON THE CRIMINAL

3   HISTORY AS FAR AS CONVICTIONS.  BUT THERE ARE A LOT OF LAW

4   ENFORCEMENT CONTACTS THAT ARE STILL MORE RECENT.

5          SO, I'M NOT PUTTING ANY UNDUE WEIGHT ON THOSE.  I REALIZE

6   THOSE ARE JUST LAW ENFORCEMENT CONTACTS.  BUT THERE ARE STILL

7   SEVERAL.  AND THERE'S ONE  -- THERE'S THE WEST HOLLYWOOD ONE FOR

8   ASSAULT WITH A DEADLY WEAPON.

9          IS THAT RELATED TO THIS CASE, OR IS THAT RELATED TO

10  SOMETHING ELSE?

11         MS. LA BARRE:  THAT'S RELATED TO SOMETHING ELSE, YOUR

12  HONOR, NOT SPECIFICALLY THIS CASE.  HOWEVER, I WILL  -- YES, YOUR

13  HONOR IS CORRECT THAT THESE ARE MERELY ARRESTS.  I BELIEVE THAT

14  MR. O'REILLY'S MENTAL ILLNESS WAS UNDIAGNOSED FOR MANY YEARS,

15  UNTREATED.

16         THE COURT:  OKAY.

17         MS. LA BARRE:  NOW THAT HE IS RECEIVING REGULAR

18  MEDICATION HE IS, AS DR. FAERSTEIN  -- I GUESS I SHOULD REALLY DEFER

19  TO DR. FAERSTEIN AS HE IS THE EXPERT  -- HIS MOOD IS STABLE.  HIS

20  THOUGHT PROCESS IS NOW LINEAR AND RATIONAL AND HE'S IMPROVED

21  SIGNIFICANTLY  --

22         THE COURT:  YEAH.  AND I  --

23         MS. LA BARRE:  -- ON HIS MEDICATION.

24         THE COURT:  -- ABSOLUTELY A HUNDRED PERCENT CREDIT ALL

25  OF THOSE THINGS AS WELL, ESPECIALLY BECAUSE I'M IN NO POSITION TO

1    QUESTION THEM.

2              THE THING THAT I AM CONCERNED ABOUT, THOUGH, IS THAT IT'S

3    ONE THING TO BE COMPLIANT WHEN YOU ARE IN A CUSTODIAL SITUATION

4    OBVIOUSLY.  IT'S A WHOLE OTHER MATTER TO BE COMPLIANT WHEN YOU'RE

5    OUT ON YOUR OWN.

6              AND WHAT I'M  -- I KNOW ENOUGH ABOUT THIS TO KNOW I DON'T

7    QUESTION THE DIAGNOSIS, BUT I DO KNOW ENOUGH ABOUT THE RISKS OF

8    DECOMPENSATION AND THE RISK OF MEDICATION JUST STOPS BEING TAKEN

9    FOR A VARIETY OF REASONS.  I DON'T THINK IT'S DONE INTENTIONALLY IN

10   SOME WAY TO EVADE REQUIREMENTS.  I JUST THINK THOSE THINGS KIND OF

11   HAPPEN.

12             AND, SO, YOU KNOW, WHEN I'M THINKING ABOUT WHAT KIND OF

13   CONDITIONS CAN BE TAILORED, OBVIOUSLY ONE OF THE MOST IMPORTANT

14   THINGS I HAVE TO THINK ABOUT IS NOT JUST BY FIAT DEMANDING

15   COMPLIANCE.  THAT DOESN'T DO MUCH IF WE DON'T THINK THAT THERE'S A

16   STRUCTURE AROUND IT BY WHICH WE CAN SORT OF INSURE COMPLIANCE

17   AS REASONABLY AS WE CAN SHORT OF BEING IN CUSTODY.

18             I GUESS I'M STILL NOT SEEING WITHOUT THERE'S A PLACE TO

19   LIVE, THERE'S A JOB THAT HE CAN AT LEAST SORT OF START KICKSTARTING

20   BACK UP.

21             I GUESS WHAT KIND OF STRUCTURE WOULD THERE BE.  I MEAN,

22   WOULD IT BE WITH HIS EX-WIFE TO MAKE SURE THAT MEDICATION IS BEING

23   TAKEN, TO MAKE SURE THAT APPOINTMENTS ARE BEING KEPT.  I MEAN, WE

24   WOULD ONLY LEARN TOO LATE IF THESE THINGS ARE NOT BEING COMPLIED

25   WITH.  AND, SO, THAT'S REALLY THE FOCAL POINT OF THE CONCERN I HAVE

1   IN THE SENSE THAT I AGREE WITH YOU THAT I'M NOT PREJUDGING IT BUT

2   CLEARLY I THINK A LOT OF THESE LAW ENFORCEMENT CONTACTS HAVE TO

3   HAVE SOME KIND OF A MENTAL HEALTH CONNECTION.  THEY'RE STILL VERY

4   RECENT.  AND I WOULD PROBABLY HAZARD A GUESS THAT THEY MAY HAVE

5   SOME CONNECTION WITH EVEN THE UNDERLYING CHARGES HERE.

6           AND, OBVIOUSLY, IT DID LEAD TO A PERIOD OF TIME WHERE YOU

7   WERE UNABLE TO WORK WITH HIM.   AND, SO, THEREFORE, YOU KNOW, WE

8   HAD TO GO THROUGH ALL THAT.

9           SO, I  DON'T WANT TO MISREAD THE SITUATION -- WHERE HE'S

10  STABILIZED NOW AS A RESULT OF THE MEDICATION AND THE

11  INCARCERATION SUGGESTS THAT WE CAN NOW JUST TRANSPLANT THAT

12  OUTSIDE OF THE CUSTODIAL SETTING AND EVERYTHING WILL BE THE SAME.

13          SO, TALK TO ME ABOUT FASHIONING THOSE SET OF CONDITIONS

14  BEYOND JUST SORT OF SAYING TAKE YOUR MEDICATION.

15          MS. LA BARRE:  RIGHT.

16          THE COURT:  OBVIOUSLY I CAN SAY THAT.  BUT I NEED A LITTLE

17  BIT MORE THAN THAT.

18          MS. LA BARRE:  YES, YOUR HONOR.

19          I DID SPEAK TO MS. REILLY ABOUT THIS EXACT SITUATION.

20          THE COURT:  UH-HUH.

21          MS. LA BARRE:  SHE IS WILLING TO GUIDE MR. O'REILLY AND

22  HELP  -- MR. O'REILLY AND HELP HIM THROUGH THE PROCESS OF OBTAINING

23  A THERAPIST.

24          THE COURT:   BE A THIRD-PARTY CUSTODIAN?

25          MS. LA BARRE:  I HAVE NOT SPOKEN TO HER DIRECTLY ABOUT

1   THAT.  BUT CERTAINLY I THINK THAT IF THE COURT REQUIRES THAT I CAN

2   CERTAINLY – I THINK SHE WOULD BE AMENABLE TO BEING A THIRD-PARTY

3   CUSTODIAN.

4           THE COURT:  AND THERE'S SOME FEASIBILITY THERE IF SHE'S

5   CLOSE BY AND SHE CAN ALSO PROVIDE SOME MONITORING AND HELP WITH

6   THAT.  I MEAN, I JUST THINK IN THIS KIND OF SITUATION BEING ALONE  --

7           MS. LA BARRE:  CORRECT.

8           THE COURT:  -- IS PROBABLY NOT  -- YOU KNOW, BUT, OF

9   COURSE, BEING UNDER THE SUPERVISION OF SOMEONE THAT IS A FAMILY

10   MEMBER IS A SLIGHTLY DIFFERENT MATTER.  AND IF SHE WERE ABLE TO

11   CHECK IN, REPORT TO THE PRETRIAL SERVICES OFFICER ABOUT

12   MEDICATION, ABOUT THE APPOINTMENTS AND THINGS LIKE THAT, THAT

13   WOULD BE IN ADDITION TO THE OTHER CONDITIONS I THINK ARE A VERY

14   REASONABLE THING.

15           BUT WE HAVE TO GIVE HER THE CHANCE TO MAKE SURE SHE

16   UNDERSTANDS THAT I'M IMPOSING AN AFFIRMATIVE OBLIGATION ON HER OF

17   SUPERVISION BEYOND JUST THE OBLIGATION OF BEING A SURETY IN THE

18   EVENT THAT HE BREACHES.  I'M TALKING ABOUT AFFIRMATIVE DUTIES AS A

19   CUSTODIAN  --

20           MS. LA BARRE:  GIVEN MY DISCUSSION WITH MS. REILLY I

21   BELIEVE SHE WOULD BE AMENABLE --

22           THE COURT:   RIGHT.

23           MS. LA BARRE:  -- TO THAT.  SHE IS WILLING TO HELP HIM OUT  --

24   HELP HIM RESTART HIS INSURANCE WITH KAISER -- HE HAD INSURANCE

25   PREVIOUSLY THROUGH KAISER  -- SO HE CAN RECEIVE THERAPY THROUGH

1    KAISER AS WELL AS MEDICATION.

2            HE IS RECEIVING ALSO A MONTHLY SHOT, A LONG-LASTING

3    SHOT OF MEDICATION THAT AVOIDS THE NEED FOR DAILY MEDICATION.

4            THE COURT:  AND I GUESS THE LAST QUESTION IS IS THERE A

5    THOUGHT TO, OR IS THERE EVEN AN OPTION TO DO AS A TRANSITION

6    BETWEEN RELEASE AND THEN BEING ON YOUR OWN IN AN APARTMENT

7    SOME KIND OF A RESIDENTIAL MENTAL HEALTH TREATMENT.

8            I KNOW THERE'S DUAL DIAGNOSES, BUT MR. HANOHOV, IS

9    THERE SUCH A  -- JUST A RESIDENTIAL MENTAL HEALTH TREATMENT

10   OPTION?

11           U.S. PRETRIAL SERVICES AND PROBATION OFFICER:   I'M NOT

12   SURE, YOUR HONOR.

13           THE COURT:  YOU'RE UNSURE.

14           U.S. PRETRIAL SERVICES AND PROBATION OFFICER:  CORRECT.

15           THE COURT:  OKAY.

16            MS. BARRE  -- MS. LA BARRE, ARE YOU AWARE OF ANY?

17           MS. LA BARRE:  CAN I HAVE A MOMENT, YOUR HONOR?

18           THE COURT:  YEAH.

19           (PAUSE IN PROCEEDINGS.)

20           MS. LA BARRE:  WE DO HAVE A  SOCIAL WORKER WHO'S

21   EMPLOYED BY OUR OFFICE ASSISTING  -- WHO ACTUALLY WORKED WITH THE

22   SAN FRANCISCO FEDERAL PUBLIC – PUBLIC DEFENDER'S OFFICE -- COUNTY

23   PUBLIC DEFENDER'S OFFICE FOR A NUMBER OF YEARS  -- WHO CAN ASSIST

24   MR. O'REILLY WITH OBTAINING RESIDENTIAL MENTAL HEALTH SERVICES.

25           THE COURT:  RIGHT.

1              MS. LA BARRE:  THE PROBLEM IS IS THAT HE ACTUALLY HAS TO

2     BE A RESIDENT, PHYSICALLY PRESENT IN SAN FRANCISCO BEFORE WE CAN

3     GET THAT STARTED.

4              THE COURT:  OH, I SEE.   SO, YOU CAN'T GO  -- WELL, ISN'T HE

5     CONSIDERED A RESIDENT ALREADY SINCE HE HAS A DOMICILE THERE, AN

6     APARTMENT.

7              MS. LA BARRE:  HE IS.  BUT I UNDERSTAND THE BUREAUCRACY

8     THERE REQUIRES HIM TO FILL OUT PAPERWORK IN PERSON.  AND  --

9              THE COURT:  OH, I SEE.  SO, HE --

10              MS. LA BARRE:  I UNDERSTAND THERE'S A LOT OF

11    BUREAUCRACY  --

12              THE COURT:  RIGHT.

13              MS. LA BARRE:  -- ACCORDING TO MY SOCIAL WORKER.

14              THE COURT:  BUT BASICALLY YOU'RE SAYING THERE'S NOT A

15    WAY TO LIKE LITERALLY GO FROM HERE RIGHT INTO A RESIDENTIAL.  YOU

16    WOULD NEED TO AT LEAST AS AN INTERIM STEP GO BACK TO SAN

17    FRANCISCO AT HIS APARTMENT AND THEN ARRANGE FOR A RESIDENTIAL --

18              MS. LA BARRE:  I BELIEVE SO, YOUR HONOR.

19              THE COURT:  -- MENTAL HEALTH TREATMENT.

20              I MEAN, WOULD YOU BE AMENABLE  -- WOULD YOUR CLIENT BE

21    AMENABLE TO SOMETHING LIKE THAT?  THAT WOULD BE A MUCH MORE

22    SUPERVISED AND, YOU KNOW, SEMI CUSTODIAL SETTING AT FIRST BEFORE

23    GOING BACK TO, YOU KNOW, THE HOME.

24              MS. LA BARRE:  MAY I HAVE A MOMENT, YOUR HONOR?

25              THE COURT:  YES.

1        (PAUSE IN PROCEEDINGS.)

2        THE COURT:  AND, MS. LA BARRE, BEFORE YOU ANSWER THAT

3   QUESTION.  I MEAN, IN ADDITION TO -- I REALIZE MAYBE HE MIGHT NOT GET

4   FINAL PLACEMENT, BUT IS THERE A WAY THAT WE COULD AT LEAST GET

5   SOME KIND OF A PROVISIONAL UNDERSTANDING OF WHETHER THERE MIGHT

6   BE A BED SPACE FOR HIM AT A RESIDENTIAL HEALTH TREATMENT?

7        IN OTHER WORDS, RATHER THAN JUST GOING OFF AND HOPING

8   FOR THE BEST, COULD  WE GET ANY KIND OF SENSE OF -- AND I KNOW YOU

9   MAY NOT KNOW DIRECTLY, BUT IN YOUR EXPERIENCE DO YOU THINK THAT

10   GETTING SOME KIND OF AT LEAST PROVISIONAL UNDERSTANDING THAT

11   THERE IS A PATH AT A PARTICULAR LOCATION AND AN APPLICATION

12   PROCESS, ET CETERA, WOULD THAT BE KNOWABLE BEFORE?

13        MS. LA BARRE:  MY UNDERSTANDING SPEAKING WITH MY SOCIAL

14   WORKER IS THAT IT'S VERY DIFFICULT.  UNFORTUNATELY, THERE'S A LOT OF

15   PEOPLE IN NEED OF SERVICES IN SAN FRANCISCO.

16        THE COURT:   YES.

17        MS. LA BARRE:  AND SIMPLY NOT ENOUGH RESOURCES –

18        THE COURT:   YEAH.

19        MS. LA BARRE:  -- WHICH IS ANOTHER REASON WHY THEY

20   REQUIRE PEOPLE TO APPEAR IN PERSON.

21        OUR PREFERENCE WOULD BE FOR MS. YULIA REILLY TO ACT AS

22   A THIRD-PARTY CUSTODIAN OF MR. O'REILLY, AND FOR HIM TO OBTAIN

23   OUTPATIENT TREATMENT AS SOON AS POSSIBLE, REPORT TO PRETRIAL

24   SERVICES, HAVE LOCATION MONITORING AND, OF COURSE, TAKE HIS

25   MEDICATION AS ORDERED BY HIS TREATING PROVIDER.

1          THE COURT:  OKAY.

2          I MEAN, REALLY YOUR ARGUMENT TO ME THAT HE'S NOT GOING

3    TO BE A RISK OF NONAPPEARANCE AND DANGER REALLY DOES HINGE,

4    DOESN'T IT, ON HIM MAINTAINING A STABLE, YOU KNOW, TREATMENT AND

5    LIFESTYLE WITH RESPECT TO HIS MENTAL HEALTH, RIGHT.   I MEAN, IF THAT

6    FALLS APART, EVERYTHING ELSE SORT OF CRUMBLES ON TOP WITH IT,

7    DOESN'T IT?

8          MS. LA BARRE:  I UNDERSTAND WHAT YOU'RE SAYING, YOUR

9    HONOR.  BUT MR. O'REILLY IS  -- HE IS THINKING RATIONALLY NOW.  HE

10   WANTS  -- HE REITERATED WITH ME MANY MULTIPLE TIMES THAT HE FEELS

11   MUCH BETTER NOW.  HE WANTS TO CONTINUE HIS TREATMENT.  HE DOESN'T

12   WANT TO GO BACK TO THE PHASE HE WAS EARLIER THIS YEAR.  HE WANTS

13   TO SEE HIS DAUGHTER.  HE WANTS TO REESTABLISH HIS RELATIONSHIPS

14   WITH HIS FRIENDS AND HIS FAMILY.  HE DOESN'T WANT TO GO BACK TO THE

15   LIVING NIGHTMARE THAT HE WAS IN EARLIER THIS YEAR AND LAST.

16         THE COURT:  OKAY.

17         MS. LA BARRE:  SO, HE IS INCREDIBLY MOTIVATED TO TAKE HIS

18   MEDICATION.  AND HE WILL ENDEAVOR TO DO SO IMMEDIATELY UPON HIS

19   RELEASE, REESTABLISH HIS HEALTH INSURANCE, AND FIND A MENTAL

20   HEALTH PROVIDER AND GET PRESCRIBED MEDICATION.

21         THE COURT:   LET ME JUST HAVE MR. SANTIAGO MAKE SOME

22   REMARKS.  AND, THEN, MS. LA BARRE, I'LL GIVE YOU THE LAST WORD.

23         MS. LA BARRE:  THANK YOU.

24         THE COURT:  SO, MR. SANTIAGO, I THINK  -- YOU KNOW, I

25   APPRECIATE – OBVIOUSLY WHEN IT COMES TO THE NATURE OF THE

1    OFFENSES HERE, THAT THE IMPERSONATION OF AN OFFICER COMBINED

2    WITH FRAUDULENT I.D., COMBINED WITH WEAPONS AND WITH WITNESS

3    TAMPERING I DON'T TAKE THOSE THINGS LIGHTLY.

4              BUT AT SOME POINT I HAVE TO JUST SIMPLY ALLOW HIM TO

5    DEFEND AGAINST THOSE THINGS.

6              WHAT I'M MOST CONCERNED ABOUT IS NOW CAN WE NOT SET

7    ANY SET OF CONDITIONS, YOU KNOW, WITH MENTAL HEALTH BEING

8    OBVIOUSLY THE PRIMARY FOCUS OF THESE CONDITIONS, AND ELECTRONIC

9    MONITORING AND THINGS LIKE THAT.

10             WHAT IS YOUR RESPONSE IF  -- YOU KNOW, ASSUMING WE ARE

11   ABLE TO SET UP SOMETHING THAT PROVIDES MENTAL HEALTH CONDITIONS

12   AND A THIRD-PARTY CUSTODIAN, IS THERE SOMETHING ELSE BEYOND JUST

13   THE NATURE OF THE OFFENSE THAT YOU ARE  -- YOU'RE POINTING ME TO?

14             MR. SANTIAGO:  YOUR HONOR, I THINK YOU HIT THE NAIL ON THE

15   HEAD AS FAR AS THE STRUCTURE HERE.   AND I DO WANT TO JUST TOUCH

16   ON THE MENTAL HEALTH A LITTLE BIT AND ADDRESS SOME OF YOUR

17   COMMENTS  --

18             THE COURT:  UH-HUH.

19             MR. SANTIAGO:  -- TO DEFENSE COUNSEL.

20             THE COURT:   YEAH.

21             MR. SANTIAGO:   REGARDING THAT ASSAULT WITH A DEADLY

22   WEAPON,.THAT WAS IN APRIL OF 2021.  IT IS DOCUMENTED IN THE FILE, DR.

23   FAERSTEIN'S REPORT, HOW HE, DEFENDANT, PULLED A KNIFE ON

24   SOMEBODY AT A NIGHT CLUB.   AFTER HE  -- ONCE ALL THIS WAS HAPPENING

25   AND SAID, ONCE AGAIN, HE WAS A FEDERAL PROTECTIVE SERVICES

1    OFFICER.   SO, THAT'S BEEN AN ONGOING THING.

2              THE COURT:   RIGHT.

3              MR. SANTIAGO:  AND, YOU KNOW, I ALSO WANT TO POINT OUT I

4    WASN'T THERE  --

5              THE COURT:  ONGOING THING IN WHICH HE IS IN AN UNTREATED

6    AND UNMEDICATED PERIOD OF TIME, RIGHT?

7              MR. SANTIAGO:  WELL, HE'S KNOWN SINCE -- I'M NOT SURE

8    ABOUT THE EXACT DATE ABOUT THE PROCEEDINGS IN ILLINOIS.  I BELIEVE IT

9    WAS, YOU KNOW, EARLY 2000'S.  BUT HE WAS DECLARED MENTALLY

10   INCOMPETENT BACK THEN.   AND THOSE RECORDS WERE PROVIDED TO DR.

11   FAERSTEIN.  IT IS NOT THAT HE IS CHARGED WITH BEING A FELON IN

12   POSSESSION.  HE IS CHARGED WITH BEING SOMEBODY FORMALLY FOUND

13   AS MENTALLY DEFECTIVE, MENTALLY INCOMPETENT HAVING 19 WEAPONS.

14   SO, THIS IS NOT SOMETHING NEW.

15             THE COURT:  WHAT IS THE ILLINOIS MATTER YOU'RE REFERRING

16   TO?

17             MR. SANTIAGO:  THE  --

18             THE COURT:  AND IS THAT STILL OPEN OR HAS THAT BEEN

19   RESOLVED?

20             MR. SANTIAGO:  NO, THAT IS CLOSED, YOUR HONOR.

21             THE COURT:  UH-HUH.

22             MR. SANTIAGO:  BUT THE CHARGE IS A  922(G)4, POSSESSION OF

23   FIREARMS BY A PROHIBITED PERSON.   AND IN THOSE PROCEEDINGS HE

24   WAS COMMITTED FOR I THINK IT WAS APPROXIMATELY 90 DAYS.  AND THOSE

25   MATERIALS WERE PROVIDED TO DR. FAERSTEIN SHOWING HOW HE WAS

1    INCOMPETENT TO STAND TRIAL BACK THEN AS WELL.

2              THE COURT:  WHAT WAS THE YEAR OF THAT AGAIN?

3              MR. SANTIAGO:   GIVE ME ONE MOMENT, YOUR HONOR.

4              (PAUSE IN PROCEEDINGS.)

5              MS. LA BARRE:  THE ILLINOIS CASE, YOUR HONOR, WAS IN 2002.

6              THE COURT:  OKAY.

7              (PAUSE IN PROCEEDINGS.)

8              THE COURT:  GO AHEAD, MR. SANTIAGO.

9              MR. SANTIAGO:  THE MENTAL HEALTH ASPECT  -- I MEAN, IT'S

10   BEEN A RECURRING THEME HERE.  AND I WASN'T HERE FOR THE INITIAL

11   APPEARANCE.  BUT THERE WAS NO SIGN LANGUAGE INTERPRETER AT THAT

12   INITIAL APPEARANCE.  IT WAS ONLY AT THE POST-INDICTMENT

13   ARRAIGNMENT THE FIRST TIME THIS ISSUE OF NEEDING A SIGN LANGUAGE

14   INTERPRETER SHOWED UP.

15             THE COURT:  WELL, I CAN ANSWER THAT QUESTION.  I MEAN,

16   THERE WAS VERY LITTLE PRETRIAL SERVICES REPORT INFORMATION.

17   THERE WAS  -- THERE WAS NOT AN INTERVIEW CONDUCTED.   SO, AS FAR AS

18   I REMEMBER I'M NOT EVEN SURE IF MS. LA BARRE ASKED FOR BOND, BUT

19   EVEN IF SHE DID, I THINK SHE UNDERSTOOD THAT WITHOUT ANY

20   INFORMATION IT WAS GOING TO BE HARD FOR HER TO ARGUE.

21             SO, THAT WAS A FAIRLY SUMMARY PROCEEDING.  IT WAS NOT A

22   CONTESTED DETENTION HEARING OF ANY NOTE.

23             MR. SANTIAGO:   UNDERSTOOD, YOUR HONOR.

24             BUT I DO WANT TO JUST SORT OF PIGGYBACK ON THAT A LITTLE

25   BIT.  HE'S ALSO IN THE VIDEOS THAT HAVE BEEN PRODUCED TO DEFENSE.

1   HE'S MADE THE SAME CLAIM THAT HE CAN'T HEAR.  HE NEEDS A SIGN

2   LANGUAGE INTERPRETER.

3          AND EVERY SINGLE TIME THE REACTION HAS BEEN HOW CAN

4   YOU BE READING LIPS IF YOU'RE NOT EVEN LOOKING AT US.  AND EVEN JUST

5   TODAY IN THIS COURTROOM HE'S NODDING HIS HEAD LOOKING AT DEFENSE

6   COUNSEL, LISTENING TO WHAT THEY'RE SAYING.  NOT EVEN LOOKING AT

7   THE SIGN LANGUAGE INTERPRETER.  AND  --

8   \        THE COURT:  WELL, I GUESS  -- NO ONE IS SUGGESTING HE'S

9   ENTIRELY DEAF.   IT'S JUST THAT HE HAS SOME DEAFNESS FOR WHICH

10  HAVING A SIGN LANGUAGE INTERPRETER PROVIDES AN EXTRA LEVEL OF

11  UNDERSTANDING.

12         SO, I HAVE NO DOUBT THAT HE CAN HEAR THINGS THAT ARE

13  HAPPENING.  BUT THIS IS JUST AN ADDITIONAL LAYER.

14         MR. SANTIAGO:  YEAH, IT'S JUST  -- I DON'T WANT TO BELABOR IT,

15  YOUR HONOR.  BUT  --

16         THE COURT:   YEAH.  OKAY.

17         MR. SANTIAGO:  -- AT THE LAST  -- THE INDICTMENT

18  ARRAIGNMENT EVEN THEN THE SIGN LANGUAGE INTERPRETER QUESTIONED

19  WHAT SHE WAS DOING HERSELF.

20         THE COURT:   BUT I GUESS  -- WHAT ARE YOU DRIVING AT?  --

21  THAT THERE'S  -- THAT IT'S THE DECEPTION THAT YOU'RE WORRIED ABOUT?

22         MR. SANTIAGO:  YES, YOUR HONOR.  THAT HAS BEEN A

23  CONSISTENT THEME.  AND THAT STARTED WITH THIS INVESTIGATION.

24         BUT EVEN IN THE PRETRIAL SERVICES REPORT TODAY, IT IS

25  DECEPTIVE ON ITS SURFACE.  SAYING THAT HE HAS LIVED IN SAN

1    FRANCISCO FOR THE LAST FIVE YEARS WHEN THAT IS CLEARLY NOT THE

2    CASE.  OKAY.  MAYBE HE DOES HAVE ONE APARTMENT UP THERE WITH AN

3    EX-WIFE.  BUT HE HAD TWO RESIDENCES HERE IN THE SAME APARTMENT

4    BUILDING, WHICH IS WHERE THE FIREARMS WERE FOUND.

5            SO, THAT'S THE FIRST THING.

6            AND AS FAR AS THE EMPLOYMENT, THAT IS EXTREMELY

7    CONCERNING TO THE GOVERNMENT IN LIGHT OF SORT OF HOW THIS ALL

8    SNOWBALLED.   IT SAYS HE'S GOT STABLE EMPLOYMENT, BUT WE DON'T

9    HAVE ANY IDEA WHAT THAT SORT OF STABLE EMPLOYMENT IS.

10            AND THIS SORT OF GETS BACK TO THAT STRUCTURE YOU WERE

11   ASKING ABOUT, ABOUT LIKE, YES, I MEAN, HE'S GOT THE CONFINES OF MDC

12   RIGHT NOW.  I UNDERSTAND THAT YOUR HONOR IS CURIOUS ABOUT WHAT

13   SORT OF STRUCTURE.   WE CAN MAKE SURE THAT THERE'S A STABLE

14   ENVIRONMENT THAT HE DOESN'T SLIP AND STRUGGLE WITH THESE ISSUES.

15            THE COURT:  RIGHT.

16            MR. SANTIAGO:  BUT WHAT IS THAT TYPE OF EMPLOYMENT.   WE

17   DON'T KNOW ANY DETAILS ABOUT IT.  WE DON'T KNOW WHAT COMPANY IT IS.

18   WHAT TYPE OF INVESTORS,  WHAT TYPE OF CLIENTS.  THERE'S ALMOST

19   NOTHING KNOWN ABOUT IT.

20            AND IT IS EXTREMELY TELLING THAT DEFENDANT IS ONLY ABLE

21   TO PUT UP TWO SURETIES.   YOU KNOW, I CAN'T -- YOU KNOW, EVERY

22   DEFENDANT, YOU KNOW, YOU CAN'T HOLD HIM ABOUT THEIR ABILITY TO PAY,

23   BUT HE'S GOT THREE PROPERTIES, PUTS UP TWO SURETIES ONLY PUTTING

24   UP $15,000.   ONE OF THEM ISN'T EVEN IN THE COUNTRY.

25            THE COURT:  WELL, YEAH.  WHAT'S THE -- WHAT DO I DO WITH

1    THAT FACT?  IS THAT A PROBLEM, OR IS THAT JUST A CONSIDERATION?

2              MR. SANTIAGO:  IT'S JUST A CONSIDERATION, YOUR HONOR.

3              THE COURT:  OKAY.

4              ALL RIGHT.  AND THEN WHAT'S THE THIRD PROPERTY YOU'RE

5    TALKING ABOUT?  THERE'S THE L.A.  THERE WAS THE -- THERE'S THE SAN

6    FRANCISCO.  WHAT'S THE THIRD?

7              MR. SANTIAGO:  YOUR HONOR, ON THE MORNING OF THE

8    SEARCHES IN SEPTEMBER OF 2020, THE LAW ENFORCEMENT SHOWED UP AT

9    WHAT THEY BELIEVED WAS HIS RESIDENCE.

10             THE COURT:  UH-HUH.

11             MR. SANTIAGO:  AND ON THE DAY OF A SECOND WARRANT WAS

12   OBTAINED FOR AN ADDITIONAL RESIDENCE IN THAT PROPERTY.  AND HE

13   WAS LIVING IN ONE, MAINTAINING ALL OF HIS EQUIPMENT -- HIS FIREARMS,

14   HIS TACTICAL GEAR, HIS BATONS, HIS BADGE IN THE OTHER APARTMENT.

15             THE COURT:  OKAY.

16             MR. SANTIAGO: SO, THIS IS AN INDIVIDUAL I'M TRYING TO SAY IS

17   -- HE'S GOT THREE RESIDENCES SPREAD ACROSS CALIFORNIA.  REFUSES TO

18   DISCLOSE --

19             THE COURT:  WHAT HE HAD.

20             MR. SANTIAGO:  YES.

21             THE COURT:  WHAT HE HAD.  YES.

22             MR. SANTIAGO:   BUT WILL NOT TALK ABOUT HIS EMPLOYMENT,

23   ANY DETAILS ABOUT THAT, OR HIS FINANCIAL CONDITION.

24             THE COURT:  WELL, I THINK, YOU KNOW, THAT HAS TO DO

25   PROBABLY MORE WITH MS. LA BARRE'S APPROPRIATE LEVEL OF CAUTION

1    BECAUSE THERE ARE AS WE TALKED ABOUT AT THE VERY BEGINNING

2    THERE'S FINANCIAL FRAUD INVESTIGATION ONGOING.

3          MR. SANTIAGO:   YES, YOUR HONOR.

4          THE COURT:  I MEAN, IT'S HARD FOR ME TO -- I MEAN, I THINK

5    THAT SHE HAS TO THREAD A NEEDLE HERE.  SHE HAS TO PROVIDE ME SOME

6    WAY OF UNDERSTANDING THAT HE'S GOT EMPLOYMENT THAT IS LEGAL AND

7    IS GOING TO PROVIDE HIM WITH A STABILITY OUTDOORS.

8          BUT I SHARE HER – I UNDERSTAND HER DILEMMA, THAT SHE

9    CAN'T, YOU KNOW, DISCLOSE EVERYTHING ABOUT FINANCES PER SE.   BUT I

10   THINK I CAN PUT HER TO A BURDEN WITHOUT HAVING HER PREJUDICE HER

11   CLIENT TOO MUCH, BUT.

12         ANYTHING ELSE?

13         I MEAN, I UNDERSTAND.  I THINK I UNDERSTAND YOUR

14   ARGUMENT.  AND I AM NOT TAKING IT LIGHTLY AT ALL.

15         MR. SANTIAGO: SO, THOSE ARE THE HIGHLIGHTS.

16         AND JUST A COUPLE IN NO SPECIFIC --

17         THE COURT:  I MEAN, I GUESS -- LET ME ASK IT TO YOU THIS

18   WAY.  I MEAN, IS THERE A SET OF EVENTS OR CIRCUMSTANCES, YOU KNOW,

19   WITH A DIFFERENT THIRD-PARTY CUSTODIAN WITH A DIFFERENT JOB

20   ENVIRONMENT, WITH A DIFFERENT RESIDENTIAL SETTING PERHAPS THAT

21   EVEN DESPITE THESE CHARGES THAT SOMEBODY THAT HAS MENTAL

22   HEALTH ISSUES COULD BE RELEASED ON BOND WITH A SET OF CONDITIONS?

23         MR. SANTIAGO:   YES, YOUR HONOR.  THE -- BUT THIS IS NOT

24   THAT CASE.

25         THE COURT:  BECAUSE THE THIRD-PARTY CUSTODIAN OF

1  THE EX-WIFE WOULD NOT BE SUFFICIENTLY RELIABLE.  WHY?

2          MR. SANTIAGO:  MULTIPLE WIVES – THE CURRENT PARTNER IN

3  ANOTHER COUNTRY NOT EVEN HERE.  THE EX-WIFE, I MEAN, HAS EVEN

4  DESCRIBED HIM IN VIDEOS AS BEING NOT TRUSTWORTHY.

5          SO, YOU KNOW, SHE -- LIKE AS YOU WERE DISCUSSING EARLIER

6  --

7          THE COURT:  I'M SORRY.  I MISSED THAT.  WHAT IS THAT FROM?

8          MR. SANTIAGO:  THE -- EVEN IN DISCOVERY THAT'S BEEN

9  PRODUCED TO DEFENSE SHE'S DESCRIBED HER FORMER HUSBAND AS

10  BEING NOT TRUSTWORTHY.  I FORGET THE EXACT TERM.

11          BUT THE FACT THAT SHE DIDN'T EVEN -- WASN'T EVEN AWARE

12  OF ALL THESE MENTAL HEALTH ISSUES UNTIL RECENTLY, JUST THAT THERE

13  WAS POTENTIALLY SOMETHING,  AND SHE'S ONLY ABLE TO PUT UP $10,000.

14  AND WE DON'T EVEN KNOW WHERE THAT $10,000 IS COMING FROM.

15          MS. LA BARRE:  IT COMES FROM HER EMPLOYMENT  --

16          THE COURT:  YEAH.  YEAH.

17          MR. SANTIAGO:  THE -- SO, YOU KNOW, I UNDERSTAND YOUR

18  HONOR'S CONCERN ABOUT HAVING THE STRUCTURE IN PLACE.  BUT IT JUST

19  ISN'T THERE WITH THESE TWO SURETIES FOR $15,000 WHERE ONE OF THEM

20  IS OUT OF COUNTRY.  AND, YOU KNOW, I DON'T EVEN KNOW WHAT THE

21  RELATIONSHIP IS LIKE BETWEEN THOSE TWO SURETIES, GIVEN THAT ONE IS

22  A CURRENT PARTNER.  THE OTHER IS A FORMER PARTNER.

23          JUST SOME OTHER THINGS I JUST WANT TO POINT OUT.

24          THE COURT:  YEAH.  I MEAN, THIS IS YOUR CHANCE TO – YOU

25  KNOW, TO PROVIDE ME ANYTHING ELSE YOU WANT ME TO KNOW.

1     MR. SANTIAGO:  THE – I ALREADY MENTIONED THE – YOU KNOW,

2 THE DANGER TO THE WITNESS OUT HERE.  IT'S NOT JUST THE PHYSICAL

3 HARM TO THE PEOPLE HE WAS LIVING WITH IN THE BUILDING OUT HERE AS

4 WELL AS THE THREATENING WITH THE KNIFE THE EMPLOYEE JUST THIS

5 PAST APRIL OUTSIDE OF A CLUB – BUT THE ECONOMIC HARM AS WELL.

6     AND GIVEN THE FACT THAT WE DON'T KNOW ANYTHING ABOUT

7 HIS EMPLOYMENT THAT HAS TIES TO PRETENDING HE'S A FEDERAL OFFICER,

8 THAT HE'S GOT TIES TO THE NAVY SEALS, THAT HE DOES FEDERAL

9 PROTECTION, THAT HE FLASHES HIS BADGE – AND THIS IS IN THE COMPLAINT

10 – I KNOW HE SAYS HE DOESN'T – HE TRAVELS OUT OF THE COUNTRY TO

11 ENGLAND.

12     HE'S USED – IN – AS DOCUMENTED IN THE COMPLAINT, HE'S

13 FLASHED HIS BADGE TO CROSS THE BORDER TO MAKE IT EASIER TO HIM.

14     SO, THIS IS NOT JUST A ONE-OFF THING, THIS RUSE ABOUT HIS

15 CONNECTIONS AND WHAT HE'S DOING.  WE DON'T KNOW –

16     THE COURT:  DO YOU HAVE – DO YOU HAVE INFORMATION YOU

17 CAN SHARE AS TO HOW FAIRLY BONA FIDE CREDENTIALS LIKE THIS WERE

18 OBTAINED?

19     MR. SANTIAGO:  THE. YES.  IT'S BEEN PRODUCED IN DISCOVERY.

20 IT'S JUST ONLINE.  HE WAS ABLE TO GO TO A WEBSITE THAT DEALS

21 SPECIFICALLY WITH OFFICERS.  AND IT'S DOCUMENTED HOW YOU CAN JUST

22 TYPE IN INFORMATION AND ORDER A BADGE.

23     THE COURT:  WHY DO THOSE WEBSITES ALLOW PEOPLE TO

24 PURCHASE THOSE THINGS SO EASILY?

25     MR. SANTIAGO:  I MEAN, THE – YEAH.  I DON'T HAVE AN ANSWER

1    FOR THAT, YOUR HONOR.  (LAUGHTER.)  BUT --

2              THE COURT:  I MEAN, ARE THESE FARSICAL TYPE OF

3    CREDENTIALS WHERE IT WOULD LOOK LIKE A 7-YEAR-OLD WOULD BE USING

4    THEM, OR –

5              MR. SANTIAGO:  NO, YOUR HONOR.  IT IS – IT IS A REAL BADGE.

6              AND THIS COMPANY MY UNDERSTANDING ONLY PROVIDES TO

7    LAW ENFORCEMENT.  MY UNDERSTANDING IS IT WAS A MISTAKE ON THIS

8    OCCASION.

9              BUT AS DETAILED IN THE COMPLAINT THERE ARE ALSO P.I.D.

10   CARDS, REAL I.D. CARDS.  AND IT'S NOT JUST ABOUT THE BADGES.  BUT

11   EVERYTHING HE HAD AROUND HIM -- TACTICAL VESTS, BATONS, POLICE-

12   STYLE PATROL VEHICLES WITH BUMPERS AND LIGHTS AND MAKING IT LOOK

13   LIKE HE IS DOING SECURITY DETAILS.  THIS IS AN ELABORATE

14   REPRESENTATION TO POTENTIAL INVESTORS THAT HE KNOWS SECURITY

15   AND DOES IT.

16              AND HE'S GOT ALL THE TOOLS FOR IT.  AND HE PURCHASED

17   THOSE TOOLS THROUGH HIS – SOME OF THOSE TOOLS, THE 19 FIREARMS,

18   THROUGH HIS FATHER USING HIS CREDIT CARD WELL AFTER HE KNEW THAT

19   HE WAS NOT ALLOWED TO DO IT.

20              AND HE HAD HIS FATHER MAKE THOSE PURCHASES AFTER HE

21   ALREADY HAD LETTERS SAYING THAT HE WAS NOT ALLOWED TO BUY

22   FIREARMS.

23              THE COURT:  ALL RIGHT.

24              MS. LA BARRE.

25              MS. LA BARRE:  THANK YOU, YOUR HONOR.

1        THE COURT:  I MEAN, I'M SURE YOU HAVE A LIST OF THINGS

2    YOU'D LIKE TO REBUT OR RESPOND TO.  BUT I GUESS EMPLOYMENT WAS

3    ONE.  AND THEN I THINK WITH RESPECT TO THIS  -- IT'S THE OVERALL SORT

4    OF TRUSTWORTHINESS  --

5        MS. LA BARRE:  RIGHT.

6        THE COURT:  -- DECEPTION QUESTION, WHETHER HIS EX-WIFE

7    WOULD BE SUFFICIENTLY ABLE TO, YOU KNOW, DO HER THIRD-PARTY

8    CUSTODIAN  --

9        MS. LA BARRE:  YES.

10        THE COURT:  -- RESPONSIBILITIES.

11        MS. LA BARRE:  WELL, PRETRIAL SERVICES IS RECOMMENDING

12    THAT HE BE EMPLOYED, MAINTAIN EMPLOYMENT AS APPROVED BY PRETRIAL

13    SERVICES.

14        SO, HE WILL HAVE TO HAVE HIS EMPLOYMENT VERIFIED AND

15    VETTED BY PRETRIAL SERVICES.

16        THE COURT:  ARE YOU PROPOSING THAT HE WILL FIND

17    SOMETHING ENTIRELY NEW OR THAT HE WOULD GO BACK TO WHAT HE WAS

18    DOING?  AND WHAT, IF ANYTHING, CAN YOU TELL ME ABOUT EMPLOYMENT  --

19        MS. LA BARRE:  HE IS EMPLOYED  --

20        THE COURT:  -- PROSPECTS?

21        MS. LA BARRE:   -- IN THE COMPUTER FIELD.  HIS SKILLS ARE IN

22    COMPUTING.  SO, HE WILL FIND A JOB.  SAN FRANCISCO IS CERTAINLY THE

23    PLACE FOR THAT IN COMPUTING.

24        AND CERTAINLY HE WILL  --

25        THE COURT:  WHAT IS THIS ONE COMPANY THAT HE HAS, THAT

1  CLIENTS THAT HE COULD WORK WITH IF RELEASED?

2           MS. LA BARRE:  YES.  HE WAS SELF-EMPLOYED.  HE WAS A

3  SELF-EMPLOYED SUBCONTRACTOR FOR CLOUD COMPUTING SERVICES.

4           IF THAT IS NOT APPROPRIATE ACCORDING TO PRETRIAL

5  SERVICES, HE WILL SEEK ANOTHER JOB.

6           HE WILL ABIDE BY ALL OF PRETRIAL'S CONDITIONS AND

7  MAINTAIN APPROPRIATE EMPLOYMENT.

8           THE COURT:  OKAY.

9           PLEASE GO ON AND ADDRESS ANYTHING ELSE YOU'D LIKE TO.

10          MS. LA BARRE:  YES, YOUR HONOR.

11          THE GOVERNMENT MAKES A BIG DEAL ABOUT THE INSTANT

12  ALLEGATIONS HERE.  BUT IT IS IMPORTANT TO NOTE THAT MR. O'REILLY IS

13  INNOCENT UNTIL PROVEN GUILTY.

14          THE NINTH CIRCUIT HAS MADE IT CLEAR IN MOTIVETTI AND

15  OTHER CASES THAT THE ALLEGATIONS ARE THE LEAST IMPORTANT FACTOR

16  – THE LEAST IMPORTANT 3142 FACTOR IN TERMS OF BOND.

17          I WOULD LIKE TO –

18          THE COURT:  WELL, WEIGHT OF THE EVIDENCE IS.  BUT THE

19  NATURE AND CIRCUMSTANCES OF THE OFFENSES ISN'T.

20          I MEAN, IT'S  --

21          MS. LA BARRE:  NO.  IT IS  --

22          THE COURT:  I MEAN, NATURE AND CIRCUMSTANCE OF THE

23  OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT.

24          MS. LA BARRE:  RIGHT.

25          THE COURT:  I AGREE WITH YOU ON THE WEIGHT OF THE

1   EVIDENCE PART OF THAT FOR SURE.

2          MS. LA BARRE:  RIGHT, YOUR HONOR.

3          THE COURT:  BUT I THINK IT MEANS YOU CAN'T TURN A BLIND

4   EYE TO WHAT THE TYPE AND CIRCUMSTANCES OF THE CHARGES ARE.

5          MS. LA BARRE:  ABSOLUTELY.  BUT I DO – THE POINT – THE

6   GOVERNMENT'S POINT THAT MR. O'REILLY'S DEAFNESS IS SOMEHOW AN

7   ACT.  AND THIS GOES TO DECEIT IS NOT WELL TAKEN  --

8          THE COURT:  I DON'T REALLY WORRY – I DON'T – AS YOU

9   PROBABLY HEARD ME THE DEAFNESS AND WHAT HE'S DOING HERE, THAT

10   THAT – I DON'T PUT ANY STOCK IN THAT.

11          I THINK ALL I CAN REASONABLY PUT STOCK IN ARE THE THINGS

12   THAT ARE MUCH MORE DOCUMENTED AS FAR AS LAW ENFORCEMENT

13   CONTACTS, THE NATURE OF THE OFFENSES  -- YOU KNOW, THINGS THAT WE

14   DON'T HAVE TO SPECULATE ABOUT.

15          I REALIZE ALL THOSE THINGS ARE PAST.  BUT, YOU KNOW,

16   OBVIOUSLY IT INFORMS MY THINKING, TOO.

17          MS. LA BARRE:  YES, YOUR HONOR.

18          I WOULD JUST LIKE TO NOTE FOR THE RECORD THAT MR.

19   O'REILLY IS CERTIFIED DEAF IN ONE EAR.  WE HAVE MEDICAL RECORDS TO

20   SUPPORT THAT HE HAD MENINGITIS AS A BABY WHICH LED  --

21          THE COURT:  YES.

22          MS. LA BARRE:  -- TO HIS DEAFNESS.

23          THE COURT:  YES.

24          MS. LA BARRE:  YOUR HONOR, REGARDING THE 2002

25   DECLARATION OF INCOMPETENCY  --

1          THE COURT:  UH-HUH.

2          MS. LA BARRE:  -- THAT WAS NOT RELATED TO AN ASSAULT.

3    THAT WAS RELATED TO A PROBATION VIOLATION  --

4          THE COURT:  UH-HUH.

5          MS. LA BARRE:  -- IN 2002.  IT WAS A THEFT THAT HE HAD A

6    PROBATION VIOLATION.

7          AND I UNDERSTAND THAT HE WAS GOING  -- HE WAS EXHIBITING

8    ERRATIC BEHAVIOR IN 2002.  HE UNDERWENT PSYCHIATRIC TREATMENT AND

9    WAS DECLARED COMPETENT AFTER  -- AFTER I BELIEVE A TWO-MONTH

10   PERIOD OF TIME WITHIN A PSYCHIATRIC FACILITY.

11         BUT THAT WAS MANY YEARS AGO.  HE HAS NOT HAD A

12   CONVICTION SINCE I BELIEVE 2004  --IF MY NOTES ARE CORRECT -- HE'S NOT

13   HAD A CONVICTION IN MANY YEARS, YOUR HONOR.

14         THE COURT:  YEAH.  NO.  I AM ABSOLUTELY TAKING NOTE OF

15   THAT.  I MEAN, IT WOULD BE 13, 15 YEARS FOR THE LAST CONVICTION.

16         IT'S JUST THE LAW ENFORCEMENT CONTEXT, YOU KNOW, AND

17   THE FREQUENCY OF – AND INCLUDING THAT PROBATION VIOLATION THAT

18   YOU – THAT YOU NOTED.

19         BUT, NO.  BUT PLEASE GO ON.

20         MS. LA BARRE:  YES, YOUR HONOR.

21         I – I  -- AGAIN, YOUR HONOR, THE FACTORS THAT THE

22   GOVERNMENT SUBMITS AS EVIDENCE OF DANGER I BELIEVE ARE RELATED

23   TO HIS MENTAL ILLNESS, WHICH IS NOW IN REMISSION AS THE EXPERT DR.

24   FAERSTEIN HAS NOTED.  HE IS NOW THINKING LOGICALLY.  HIS MOOD IS

25   NORMAL, STABLE.  HE HAS EXPRESSED NO DESIRE TO DO ANYTHING

1   UNLAWFULLY.

2           HE WILL ABIDE BY ALL CONDITIONS OF BOND INCLUDING TAKING

3   HIS MEDICATION AND RECEIVING MENTAL HEALTH TREATMENT.

4           MDC IS CURRENTLY PROVIDING HIM WITH MONTHLY INJECTIONS

5       OF MEDICATION.  AND MDC COULD PROVIDE HIM WITH AN INJECTION OF

6       MEDICATION PRIOR TO HIS RELEASE SO AT LEAST HE HAS A 30-DAY

7       PERIOD.

8   AND ALSO THE JUDGE  -- YOUR HONOR CAN ORDER THAT HE BE

9       PROVIDED WITH SEVERAL DAYS' WORTH OF MEDICATION SO HE HAS

10      MEDICATION UPON HIS RELEASE WHILE HE SETS UP HIS PRIVATE

11      PROVIDER, PSYCHIATRIC PROVIDER.

12          FOR ALL THESE REASONS HE HAS – HE HAS A GOOD

13  RELATIONSHIP WITH HIS WIFE.  I DON'T THINK THE FACT THAT HE'S HAD –

14  BEEN DIVORCED SEVERAL TIMES SHOULD BE HELD AGAINST HIM AS THE

15  GOVERNMENT CLAIMS.

16          HIS CURRENT PARTNER NATALIA JOKIEL, IF THAT IS NOT AN

17  ACCEPTABLE SURETY TO THE COURT, MS. REILLY IS  --

18          THE COURT:  WELL, YEAH.

19          MS. LA BARRE:  -- CERTAINLY WILLING TO  --

20          THE COURT:  ACTUALLY I WAS GOING TO ASK.

21          I MEAN, BECAUSE PRETRIAL ITSELF IS RECOMMENDING $50,000

22  WITH RESPONSIBLE  --

23          MS. LA BARRE:  YES.

24          THE COURT:  -- THIRD PARTY SURETY.  SO THAT – EVEN THE

25  AMOUNT THAT THEY'RE RECOMMENDING IS HIGHER.

1          I MEAN, IS THAT AN ACHIEVABLE AMOUNT WITH SOME

2   COMBINATION OF SURETIES THAT --

3          MS. LA BARRE:  YES, YOUR HONOR.

4          THE COURT:  -- THAT WOULD BE APPROVED?

5          MS. LA BARRE:  YES, YOUR HONOR.

6          THE COURT:  OKAY.

7          MS. LA BARRE:  BECAUSE OF THEIR CHILD IN COMMON, MS.

8   REILLY HAS A GOOD RELATIONSHIP.  SHE HAS BEEN ACTIVE  -- INVOLVED.

9          IF SHE DIDN'T LIKE MR. REILLY  -- MR. O'REILLY, SHE WOULDN'T

10  HAVE BEEN AT COURT AT THE POST-INDICTMENT ARRAIGNMENT.

11         HER AND MS. JOKIEL WERE PRESENT HERE IN COURT --.

12         THE COURT:  I REMEMBER THAT.

13         MS. LA BARRE:   -- FOR POST-INDICTMENT ARRAIGNMENT.

14         AND THEY WERE VERY CONCERNED.  THEY'VE BEEN –

15  CONTACTED ME FREQUENTLY.  AND THEY WANT WHAT'S BEST FOR HIM.  AND

16  WHAT'S BEST FOR HIM AND WHAT WE CAN ALL AGREE ON IS FOR HIM TO

17  CONTINUE HIS MENTAL HEALTH TREATMENT.

18         THE COURT:  UNDERSTOOD.  ALL RIGHT.

19         THANK YOU, MS. LA BARRE.

20         MS. LA BARRE:  YOU'RE WELCOME.

21         THE COURT:  MR. HANOHOV,  DO YOU HAVE ANYTHING IN LIGHT

22  OF WHAT WE'VE TALKED ABOUT THAT YOU WANT TO ADD, SUPPLEMENT,

23  CHANGE OR ANYTHING?

24         U.S. PRETRIAL SERVICES AND PROBATION OFFICER:   NO, YOUR

25  HONOR.

1          THE COURT:  OKAY.

2          ALL RIGHT.  JUST GIVE ME ONE MOMENT.

3          (PAUSE IN PROCEEDINGS.)

4          THE COURT:  MS. LA BARRE, I ASSUME I KNOW THE ANSWER TO

5    THIS, BUT THERE'S NO – THERE'S NO SECURED PROPERTIES OR ANYTHING

6    AVAILABLE, RIGHT?

7          MS. LA BARRE:  NO, YOUR HONOR.

8          THE COURT:  NOT THAT THERE HAS TO BE, BUT THERE ISN'T,

9    RIGHT?

10         MS. LA BARRE:  THERE IS NOT, YOUR HONOR.

11         THE COURT:  OKAY.

12         (PAUSE IN PROCEEDINGS.)

13         THE COURT:  AND DO I TAKE IT YOU  -- YOU WERE SUGGESTING

14   THAT RESIDENTIAL MENTAL HEALTH TREATMENT IS NOT SOMETHING THAT

15   YOU ARE AGREEABLE TO?

16         MS. LA BARRE:  IT WOULD BE DIFFICULT.  IT'S NOT THAT WE

17   DON'T AGREE TO IT.  IT WOULD BE VERY DIFFICULT.

18         FROM MY UNDERSTANDING  -- FROM MY UNDERSTANDING WITH

19   MS. – HER NAME IS INYA VERDIAN.  SHE WAS A LONG-TIME SOCIAL WORKER

20   AT THE COUNTY – COUNTY OF SAN FRANCISCO FEDERAL PUBLIC

21   DEFENDER'S OFFICE  -- NOT FEDERAL.  AND THERE IS  -- THERE ARE

22   UNFORTUNATELY JUST TOO MANY PERSONS IN NEED AND NOT ENOUGH

23   RESOURCES.

24         THE COURT:  YEAH.  IT'S – YOU KNOW, AND THAT'S THE THING

25   IS I GUESS THAT KIND OF GETS TO THE RULING THAT I'M GOING TO HAVE TO

1   GIVE, WHICH IS THAT A LOT OF THESE CONDITIONS I THINK IN THE ABSTRACT

2   MAKES SENSE AND THEY WORK.  BUT THEN THERE'S THE REALITY OF THE

3   FACT THAT THERE ARE SO MANY RESOURCE SHORTAGES, ET CETERA.

4           WELL, AS USUAL, MS. LA BARRE, YOU KNOW, NO ONE COULD

5   HAVE ARGUED FOR BOND FOR THEIR CLIENT ANY BETTER.  AND YOU'VE

6   MADE IT OBVIOUSLY VERY HARD ON ME.

7           WHAT I WOULD SAY IS I DO THINK THAT IN AN ABSTRACT WAY

8   THERE ARE BONDABLE CONDITIONS THAT CAN BE IMPOSED IN A CASE LIKE

9   THIS ONE.

10          I THINK THOUGH IT JUST SO HAPPENS THAT THE NATURE AND

11  CIRCUMSTANCES OF THE CRIME AND THE HISTORY AND CHARACTERISTICS

12  OF THIS PARTICULAR DEFENDANT PRESENT A SET OF GAPS IN WHAT WE

13  WOULD DO FOR HIM ON BOND THAT DON'T GIVE ME ENOUGH ASSURANCE

14  THAT WE CAN REASONABLY GUARANTEE  -- REASONABLY GUARANTEE HIS

15  APPEARANCE AND MOST IMPORTANTLY MAKING SURE THAT HE IS MENTALLY

16  HEALTHY AND STABLE ENOUGH TO NOT DECOMPENSATE OR TO DO

17  ANYTHING THAT I'M SURE HE WOULD NOT INTEND BUT WOULD REGRET.

18          AMONG THOSE THINGS IS THE FACT THAT THE EX-WIFE MS.

19  REILLY, ONE OF THE PROPOSED CUSTODIANS, AT LEAST HAS SOME LESS

20  THAN FULL UNDERSTANDING OF WHAT THE POTENTIAL MENTAL HEALTH

21  ISSUES ARE THAT – THAT THE DEFENDANT MAY HAVE BEEN SUFFERING AT

22  DIFFERENT TIMES.

23          IT'S HARD FOR ME TO THINK THAT SHE WOULD NOT HAVE A

24  BETTER UNDERSTANDING OF THAT WHICH GIVES ME CONCERN THAT SHE

25  COULD BE THE RIGHT CUSTODIAN ABOUT THAT.

1    THE FACT THAT WE DON'T HAVE A GOOD JOB READY TO GO  --

2   AND I REALIZE IN MANY WAYS I HAVE TO TAKE INTO ACCOUNT THE FACT

3   THAT HE'S BEEN IN CUSTODY.  SO, OBVIOUSLY, HE COULDN'T MAINTAIN

4   STEADY EMPLOYMENT.

5    BUT THE NATURE OF BEING SELF-EMPLOYED HERE COMBINED

6   WITH THE ALLEGATIONS OF THE FRAUD MAKE IT WORRISOME THAT WE

7   COULD SET UP A SET OF EMPLOYMENT CONDITIONS THAT WOULD ALSO DO

8   WHAT IT NEEDED TO DO.

9    AND FINALLY -- AND I THINK IT'S THE MOST IMPORTANT THING --

10   IT'S REALLY  -- THE LAW ENFORCEMENT CONTACTS AND THEN THE NATURE

11   OF THE OFFENSES HERE HAVE FOR ME THE  -- A TROUBLING NEXUS OF

12   THINGS, WHICH IS THEY HAVE A COMBINATION OF DECEPTION, FIREARMS

13   AND MANY INSTANCES IN WHICH PHYSICAL OR PROPERTY DAMAGE IS

14   INVOLVED.

15    AND WHEN YOU COMBINE DECEPTION, WEAPONS, AND

16   PROPERTY DAMAGE IN THE LAW ENFORCEMENT CONTACTS THAT HE'S HAD,

17   OBVIOUSLY, THERE'S MANY CAUSES TO THAT.  BUT THE FACT THAT THOSE

18   THINGS HAVE BEEN SORT OF A PERSISTENT PATTERN IN HIS LAW

19   ENFORCEMENT CONTEXT HERE.  AND GIVEN THE NATURE OF WHAT HE'S

20   ALLEGED WITH HERE IN TERMS OF THE FALSE IDENTIFICATIONS THAT HE

21   HAD, ON BALANCE, UNFORTUNATELY, I DON'T THINK A REASONABLE SET OF

22   CONDITIONS CAN BE FASHIONED TO INSURE HIS REASONABLE APPEARANCE

23   AT TRIAL AS WELL AS THE PROTECTION OF THE PUBLIC.

24    I DON'T WANT TO CLOSE THE DOOR TO YOU COMPLETELY, MS.

25   LA BARRE.  BUT I THINK AT A MINIMUM THE AMOUNTS THAT WE'RE TALKING

1    ABOUT THAT PRETRIAL IS RECOMMENDING ARE GOING TO HAVE TO BE MET.

2              THE SURETIES ARE GOING TO HAVE TO BE MUCH MORE WELL

3    VETTED AND APPROVED IN ADVANCE.

4              WE'RE GOING TO HAVE TO THINK ABOUT WHAT YOU CAN

5    REASONABLY DISCLOSE ABOUT HIS FINANCIAL SITUATION AND HIS

6    EMPLOYMENT THAT ALLOWS US TO SET A REASONABLE CONDITION.

7              AND HONESTLY HIS  -- I THINK A RESIDENTIAL TREATMENT

8    FACILITY IS GOING TO BE A MUST AS A TRANSITION BETWEEN BEING IN

9    CUSTODY AND THEN GOING TO AN APARTMENT BY HIMSELF.  I JUST THINK

10   THAT THAT SETS UP A RECIPE FOR FAILURE WITHOUT HAVING AT LEAST A

11   TRANSITIONAL PERIOD WHERE IN A SEMI-CUSTODIAL SETTING HE'S GETTING

12   HIS MEDICATIONS AND THINGS.

13             SO, I DON'T WANT TO CLOSE THE DOOR TO YOU FOREVER, MS.

14   LA BARRE.  BUT IT IS A VERY SMALL DOOR.  AND IT'S A HARD DOOR.

15             BUT BASED ON THE INFORMATION THAT I HAVE IN FRONT OF ME

16   NOW I THINK THE DEFENDANT SHOULD REMAIN DETAINED PENDING TRIAL

17   FOR THE REASONS THAT I HAVE STATED.

18             AND I WILL FILE A WRITTEN ORDER MEMORIALIZING THESE

19   FINDINGS AS WELL.

20             SO, THE DEFENDANT'S REQUEST FOR BAIL REVIEW IS DENIED.

21             DEFENDANT WILL BE REMANDED TO THE CUSTODY OF THE U.S.

22   MARSHALS AND ORDERED DETAINED PENDING TRIAL.

23             MR. SANTIAGO, ANYTHING ELSE?

24             MR. SANTIAGO:  NOTHING FURTHER, YOUR HONOR.

25             THE COURT:  MS. LA BARRE?

1          MS. LA BARRE:  NO, YOUR HONOR.

2          THANK YOU.

3           THE COURT:  THANK YOU.

4          ALL RIGHT.  WE'RE ADJOURNED.

5          THE CLERK:  COURT IS ADJOURNED.

6          (PROCEEDINGS ADJOURNED.)

7

8                         TRANSCRIBER'S CERTIFICATE

9                                DISCLAIMER

10

11      THE INTEGRITY OF THIS TRANSCRIPT MAY BE ADVERSELY AFFECTED

12           DUE TO MUFFLED AND UNCLEAR AUDIO TRANSMISSION.

13

14

15          I, Dorothy Babykin, attest that the foregoing proceedings provided to me

16    electronically were transcribed by me to the best of my ability.

17                         /s/  *Dorothy Babykin*

18

19                         Dorothy Babykin

20

21    Date:   11/15/21

22

23

24

25